OPINION OF THE COURT
Arthur E. Blyn, J.
This article 78 petition seeks a judgment vacating the order of the respondent, New York City Loft Board, which declared that the premises located at 41 and 43 Bond Street, New York, New York, constituted a single horizontal multiple dwelling covered by the Loft Law (Multiple Dwelling Law, art 7-C, § 280 et seq.). Petitioner landlord contends that the premises constitute two separate buildings and that one of the buildings, 41 Bond Street, does not qualify for Loft Law coverage.
The motion by certain tenants at the premises for leave to intervene in this proceeding was granted by this court during oral argument.
In November 1984 a tenant, Emmet Haltigan, filed an *969 application with the Loft Board seeking a determination of coverage under the Loft Law. The owner did not file an answer but did appear at a conference held at the Loft Board on August 14, 1985. At that time, after a discussion with the parties, the hearing officer narrowed the issues to whether or not 41 and 43 Bond Street constituted one building or two separate buildings. According to respondent, petitioner at that time made no specific allegations regarding the nature of the tenants’ occupation, i.e., whether or not the requisite number of occupants used the premises for residential purposes during the "window period” of April 1, 1980 to December 1, 1981. (Multiple Dwelling Law § 281 [1].)
A hearing was conducted on September 23, and October 23, 1985. In August 1986, the Loft Board issued Order No. 388, determining 41-43 Bond Street to be a horizontal multiple dwelling, consisting of four residential units in 43 Bond Street and two units in 41 Bond Street. Although 43 alone meets the coverage requirements (a minimum of three units), 41 alone does not contain the requisite number of residential units unless it is combined with 43.
Loft Law coverage affords residential loft tenants an opportunity to obtain rent stabilization protection for their units. The concept of the horizontal multiple dwelling is derived from the Rent Stabilization Law (Administrative Code of City of New York § YY51-3.1 [now § 26-505]), which provides: "For purposes of this chapter, a class A multiple dwelling shall be deemed to include a multiple family garden-type maisonette dwelling complex containing six or more dwelling units having common facilities such as sewer line, water main, and heating plant, and operated as a unit under single ownership on May sixth, nineteen hundred sixty-nine, notwithstanding that certificates of occupancy were issued for portions thereof as one- or two-family dwellings”.
Multiple Dwelling Law, article 5-A, § 163 requires garden-type maisonette projects to have the following:
"1. The dwelling units in such projects, together, or in their aggregate, do not exceed in superficial area of thirty-five per centum of the area of the site or plot upon which such projects are erected.
"2. The units in such projects do not exceed two stories in height.
"3. Each section contains not more than two apartments in any unit”.
*970 New York City Loft Board Regulations (Relating to Determination of Interim Multiple Dwelling Status) § I (A) (4) (b) sets forth the following factors for deciding whether or not the structure constitutes a single building:
"(1) whether the structure is under common ownership;
"(2) whether contiguous portions of the structure within the same zoning lot are separated by individual load bearing walls, without openings for the full length of their contiguity, as distinguished from non-load bearing partitions;
"(3) whether the structure has been operated as a single entity, having one or more of the following:
"(a) a common boiler;
"(b) a common sprinkler system;
"(c) internal passageways;
"(d) other indicia of operation as a single entity.
"(4) whether the owner or a predecessor has at any time represented in applications or other official papers that the structure was a single building;
"(5) whether a single certificate of occupancy has been requested or issued for the structure;
"(6) the pattern of usage of the building during the period from April 1, 1980 to December 1, 1981”.
There is a split of authority as to the types of buildings which can be found to constitute horizontal multiple dwellings. In Salvati v Eimicke (NYLJ, July 30, 1986, at 6, col 3 [Sup Ct, NY County, Greenfield, J.]), the court held, in effect, that only those buildings which qualify under the definition of "garden-type maisonette” would qualify for rent stabilization. However, in McDermott v S & M Enters. (NYLJ, Oct. 21, 1981, at 6, col 5 [Sup Ct, NY County, Ascione, J.]), the court held that structures which would otherwise qualify need not be maisonette-type buildings.
If Administrative Code § YY51-3.1 (now § 26-505) were construed to limit horizontal multiple dwellings to maisonettes, then few if any loft buildings could qualify. However, it appears that the word "include” does not exclude nonmaisonette buildings which have the common facilities referred to in the statute. Accordingly, it is possible for a loft structure such as 41 ana 43 Bond Street to constitute a horizontal multiple dwelling even though not a maisonette building.
The question now becomes whether or not the Loft Board determination regarding the horizontal multiple dwelling sta *971 tus was based upon substantial evidence. The Loft Board stated that the third and fourth floors of 41 Bond Street and the first through fourth floors of 43 Bond Street have been used for residential purposes. The following factors were cited by the Loft Board:
(1) the buildings have been under common ownership since 1896 and (with one exception prior to the period of petitioner’s ownership) have been transferred by means of a single deed;
(2) although the buildings have separate entrances, there are doors on the second, third and fourth floors of 43 which open onto the stairwell of 41;
(3) the buildings constitute a single zoning lot;
(4) a single certificate of occupancy was issued for the two buildings in 1927;
(5) there is a single tax bill for the buildings;
(6) there are water meters in 41 covering units in both buildings;
(7) there is a single electric meter in 41 covering the upper floors of both buildings (the ground floor and hallway of 43 are covered by a separate meter);
(8) there is a single load-bearing wall between the buildings.
The factors adding up to horizontal multiple dwelling status vary with the individual case. In Matter of Love Sec. Corp. v Berman (38 AD2d 169), the four buildings in question had been under common ownership for as long as 130 years and shared common heat and electrical facilities. In Matter of Menoudakos v Berman (32 AD2d 631), the buildings had common ownership and common facilities, and the landlord had treated the "buildings” as a single unit. On the other hand, in DeLorenzo v Krizman (NYLJ, May 16, 1986, at 12, col 1), the court found that common ownership and a common heating plant were not in themselves sufficient to make the structures into a horizontal multiple dwelling; in that case the buildings had separate entrances and access to one building could not be gained from the other, and each building had separate sewer, gas, water and electrical systems, and each was billed separately for water and real estate taxes.
Petitioner maintains that there are actually separate load-bearing walls between the buildings and that there are no common heating or sprinkler facilities between the buildings. However, these factors are not critical. The existence of a single as opposed to a double wall is not as important as the *972 existence of such items as common electrical facilities. Moreover, the reason that there are no "common” boiler or sprinkler systems between the buildings is that there are no building-wide boilers or sprinklers at all.
The Loft Board decision had a rational basis and was neither arbitrary nor capricious. The long-time common ownership, taken together with the interconnected passageways, common water meter and common electric meter, establish an intent to treat 41 and 43 as a single building. This case appears to fall into the pattern of such cases as Love Sec. and Menoudakos (supra).
There apparently is some dispute as to whether the occupants used the premises for residential purposes during the window period. However, petitioner never answered the tenant’s original application, nor did he raise the issue of residential use at the conference during which the issues (to be tried at the hearing) were to be framed. On September 23, 1985, the first date of the hearing, the Hearing Officer informed both petitioner (and a contract vendee for the property) that any issues (other than horizontal multiple dwelling status) were to be raised in writing by the following Friday. Petitioner failed to raise the issue of residential use within the time specified. Moreover, even now, upon this article 78 proceeding petitioner has not submitted evidence showing lack of residential use.
Accordingly, the petition herein is dismissed.
Petitioner shall join the interveners as parties with respect to any appeal taken from this judgment.